La Salle National Bank, a National Banking Association, as Trustee Under Trust Agreement Dated May 28, 1963, and Known as Trust No. 31046, Plaintiff-Appellee, v. Village of Palatine, Defendant-Appellant.

Gen. No. 52,169.

First District, Third Division.

February 23, 1968.

Wooster, Mugalian, Thomas & Klingner, of Chicago (Richard A. Mugalian and Charles C. Wooster, of counsel), for appellant.

Leonard Bosgraf, of Chicago, for appellee.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

This is a zoning case involving the validity of the Village of Palatine's zoning ordinance as it affects certain property held in trust by the plaintiff. The trial court declared the ordinance unconstitutional and void in its application to the property and the Village appeals.

The plaintiff's land consists of three adjoining lots located at the southeast corner of the intersection of Palatine and Quinten Roads. Palatine runs east to west and Quinten north to south. The land is vacant, is slightly depressed, and has approximately 150 feet of frontage on Palatine Road and 157 feet on Quinten.

This corner is also the extreme northwest corner of both the Village and a twelve-block subdivision which is classified as an R–2 single-family dwelling district under the Village's zoning ordinance. This subdivision contains 240 lots of which, at the time of trial, 222 had been developed with single-family residences. Of the remaining 18 vacant lots, two lie immediately east of the subject property on Palatine Road and one is directly south on Quinten Road.

The property faces unincorporated areas of Cook County on both the west and north. To the north is a forty-acre tract of land which, with the exception of one dwelling, is entirely vacant and has a ditch running through a portion of it. This tract is zoned R–5 (multiple dwelling) under the County zoning ordinance. To the east of this tract are multifamily dwellings.

329

To the west of the plaintiff's property is a wooded area and to the west of this there is a tavern housed in a residential-type structure. The tavern is on a four-hundred foot deep lot, is situated approximately 250 feet from Quinten Road, and has its entrance on Palatine Road. Slightly southwest of the tavern is a lot which is used for the parking of trucks; the entrance to this parking lot is on Crescent Avenue—a block to the west of Quinten. North across Palatine Road from the tavern is a yard used by a construction company for the storage of material and equipment. It has a row of evergreens fronting on Palatine Road and it appears that only the back portion of the lot is devoted to storage purposes. All of these uses are nonconforming, the land being zoned R–4 (single-family residence) under the County zoning ordinance. East of the storage yard, near the northwest corner of the Palatine-Quinten intersection, is a single-family residence.

In an unincorporated area a mile or two south of the property on Quinten there are two industrial complexes. Approximately three-quarters of a mile north of the property on the east side of Quinten is a manufacturing company situated upon property so zoned. According to a comprehensive land use plan adopted by the Village in 1964, if it should ever annex the unincorporated acreage north of the plaintiff's property on Palatine Road it would zone part of the acreage abutting on the east side of Quinten for manufacturing purposes. If it should ever annex the unincorporated acreage on the west side of Quinten, part of the area fronting on Quinten would be developed as a shopping center.

If the present zoning is invalidated the plaintiff will sell the property to an oil company which plans to erect a modern, landscaped service station on the site with four pumps and underground facilities for the storage of 16,-000 gallons of gasoline. Both Palatine and Quinten Roads are two lanes wide. The average weekday traffic at the

intersection according to a 1963 count was 5,000 vehicles on Palatine and 2,000 on Quinten. The closest gasoline stations are at least one mile distant. There are two at this distance to the east and one to the north. The nearest station to the west is five miles away; the record does not show whether there is a station to the south.

The expert witnesses for the plaintiff testified that the highest and best use of the property would be for a gasoline station because: there were no other stations within a mile of the property; the property was situated at a major intersection; the nonconforming uses in the unincorporated area lent a commercial aura to the property; the Village's comprehensive plan revealed a shopping center might be erected directly west of the site; the land had remained vacant for years, and the lots were part of an older type subdivision.

The beneficiary of the land trust purchased the property in 1963 and was aware of its residential zoning at that time. He testified that the property could be developed for residential purposes, but that it would not be the best use. There is no indication in the record as to how much he paid for the property, but one of the plaintiff's witnesses testified that its market value was $9,000 for single-family residence use. The oil company agreed to pay $35,000 for it if rezoning would permit its use for a gas station.

The expert for the Village testified that the surrounding area was primarily residential in nature; that a gasoline station would be an unwarranted intrusion into the vicinity which would retard residential growth and violate sound planning principles; that the roads intersecting at the corner of the property were "collector" streets serving the surrounding expanding residential districts, and that the best use would be to convert the present three lots into two single-family residence parcels. Two nearby homeowners testified in substance that they had purchased their property in reliance upon the residential

zoning of the area and that both the value of their property and the desirability of residing on it would be diminished by the existence of a service station on the corner lots.

The plaintiff injected another factor into this case. Its evidence disclosed that two of the corner lots were subject to a restrictive covenant limiting the ownership and use of the property to members of the Caucasian race. This covenant was inserted in two deeds executed in 1928 and one executed in 1931. It does not appear in deeds thereafter although there were subsequent transfers. In addition to the above covenant, the aforementioned deeds also contain the following:

"Subject to the following restrictions:

"Zoning and building ordinances.

"Above described lots shall be known as business lots. . ."

 The covenant restricting the ownership and use of two of the lots to Caucasians is meaningless. Such clauses are judicially unenforceable. Shelly v. Kraemer, 334 US 1, 92 L Ed 1161, 68 S Ct 836 (1947). The covenant declaring that the realty should be known as business lots carries little weight. First, the covenant does not limit the use of the land. Restrictive covenants are to be stringently construed and any doubts or ambiguities must be resolved in favor of natural rights and against restrictions. Piper v. Reder, 44 Ill App2d 431, 195 NE2d 224 (1963). The language in the two deeds does not restrict the *use* of the property, but merely states that the lots shall be *known* as business lots. This language cannot be interpreted as a limitation upon the use of the property. Another factor supporting this construction is that the racial covenant was not only explicit as to the use of the property but it also included a provision for reversion to the heirs of the grantors if the

covenant was broken. Having used such language in conjunction with that covenant, it would seem logical that if the grantors intended a restriction upon use in the present covenant they would have inserted precise language to that effect and would have also included a reversion provision therein. This they did not do. Second, if it were to be assumed that the language does in fact constitute a restrictive use, the deeds themselves provide that the restriction is subordinate to zoning or building ordinances. Where covenants impose restrictions which are less severe than the restrictions of a zoning ordinance, the provisions of the ordinance will control and become superior in force to the less restrictive provisions of the covenants. Cf. II Yokley, Zoning Law and Practice, § 20–4 (3rd ed 1967) ; II Metzenbaum, Law of Zoning, c X–d (2d ed 1955).

The Village's comprehensive use plan while entitled to consideration is not controlling. Ill Rev Stats (1965), c 24, § 11–12–6, authorizes municipalities to formulate comprehensive use plans for their areas. In doing so, a municipality is permitted to include in the plan all unincorporated, contiguous property within a mile and a half of its boundaries. The statute provides, however, that these plans are advisory only and may not be construed to regulate or control the use of private property. Such comprehensive plans may be altered at any given moment. Moreover, even if such a plan is not changed, it is quite possible that a municipality will be unsuccessful in annexing the adjacent territory and will therefore be unable to apply its zoning laws to the property.

 A presumption exists in favor of the validity of a zoning ordinance and the one who attacks it has the burden of overcoming the presumption by clear and convincing evidence that, as to his property, the ordinance is arbitrary and unreasonable and without substantial relation to the public health, morals, safety and welfare. Bennett v. City of Chicago, 24 Ill2d 270, 181 NE2d 96

(1962). Among the factors to be considered in determining the validity of a zoning ordinance are the character of the neighborhood, the classification and use of nearby properties, the extent to which property values are diminished by the particular restriction, the suitability of the subject property for the zoned purposes and the gain to the public as compared to the hardship on the property owner. People ex rel. Larsen v. City of Chicago, 24 Ill2d 15, 179 NE2d 676 (1962); Tillitson v. City of Urbana, 29 Ill2d 22, 193 NE2d 1 (1963). Of these, the most important is the zoning and use of the surrounding property. Maywood Proviso State Bank v. Village of Berkeley, 55 Ill App2d 84, 204 NE2d 144 (1965); Colvin v. Village of Skokie, 54 Ill App2d 22, 203 NE2d 457 (1964). In examining the surrounding property a court must take into consideration the zoning and use of nearby property outside the limits of the municipality which has enacted the ordinance. Berger v. Village of Riverside, 69 Ill App 2d 148, 216 NE2d 479 (1966); Gordon v. City of Wheaton, 12 Ill2d 284, 146 NE2d 37 (1957).

██ The plaintiff's property is surrounded on all four sides by residences or by vacant land zoned for residential and multiple-family development. The industrial complexes to the south and the manufacturing plant to the north are so far removed that they do not infringe upon the residential complexion of the neighborhood, and the close-by nonconforming uses have little discernible effect upon the plaintiff's property. The presence of nonconforming uses does not automatically invalidate zoning (Trendel v. Cook County, 27 Ill2d 155, 188 NE2d 668 (1963)) for their existence can be assumed in any area. LaSalle Nat. Bank v. City of Chicago, 68 Ill App2d 412, 216 NE2d 224 (1966).

██ ██ The amount of traffic on the intersecting roads is not particularly heavy. The increase in traffic which can be presumed to have taken place since the 1963 traffic count is a problem confronting every com-

munity and is not peculiar to Palatine and Quinten Roads. Property fronting on a highly traveled state highway, although suited for commercial use, can properly be zoned residential if the surrounding neighborhood is predominantly residential. Herzog Corp. v. City of Des Plaines, 3 Ill2d 206, 119 NE2d 732 (1954). The fact that the property's value will be enhanced if a gasoline station is permitted does not justify the conclusion that the ordinance is confiscatory. Liberty Nat. Bank v. City of Chicago, 10 Ill2d 137, 139 NE2d 235 (1956).

 Every zoning case must be decided on its own facts. People ex rel. Selvaggio v. Village of River Grove, 68 Ill App2d 383, 216 NE2d 218 (1966). The evidence in the present case falls short of overcoming the presumptive validity of the ordinance. The best that can be said for the plaintiff's evidence is that it may raise a reasonable difference of opinion as to the ordinance's validity and, under such circumstances, the judgment of the legislative body must prevail. Standard State Bank v. Village of Oak Lawn, 29 Ill2d 465, 194 NE2d 201 (1963).

The judgment is reversed.

Reversed.

SCHWARTZ and SULLIVAN, JJ., concur.